UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE


**Diane Bell**

    **v.**                                   Case No. 11-cv-45-PB
                                        Opinion No. 2012 DNH 010
**Michael J. Astrue, Commissioner,**
**Social Security Administration**


**MEMORANDUM AND ORDER**

Diane Bell seeks judicial review of a decision by the
Commissioner of the Social Security Administration denying her
application for supplemental security income benefits.  Bell
contends that the Administrative Law Judge ("ALJ") who
considered her application made multiple errors in assessing her
residual functional capacity ("RFC") and in eliciting vocational
expert testimony.  For the reasons provided below, I grant
Bell's motion to reverse and remand the Commissioner's decision.


**I.   BACKGROUND**[1]

Bell applied for supplemental security income benefits on
August 15, 2008, when she was fifty-two years old.  She alleged

---

[1] The background information is taken from the parties' Joint
Statement of Material Facts.  See L.R. 9.1(b).  Citations to the
Administrative Transcript are indicated by "Tr."

a disability onset date of August 1, 2006, due to spinal stenosis and other allegedly disabling conditions.  She finished the eleventh grade and did not subsequently obtain a GED.  She last worked in 1992.

## A.   Bell's Medical Conditions and Treatment

Bell visited numerous treatment providers for her conditions.  She received treatment at GEROMED PC between May and October 2006.  During that time, she reported feeling depressed and suffering from hip, hand, shoulder, and neck pain. She was diagnosed with bipolar disorder, depression, chronic pain, and fibromyalgia, and was prescribed pain and depression medication.  After a number of follow-up appointments, the providers noted that her bipolar disorder generally was not well controlled, her chronic pain continued, and her fibromyalgia was generally stable.

Bell visited Riverfront Medical Group in December 2006. She was more tearful and sad than usual.  Her chronic back and joint pain was noted to be stable on medication.  During January and February 2007 follow-up visits, Bell reported increased mood swings and depression.  She was instructed to restart Seroquel, a psychotropic medication she had stopped taking due to weight gain.  Her pain was again noted to be stable on medication.

In March 2007, Bell presented for another appointment at
Riverfront.  She stated that her back pain had left her
bedridden for two weeks prior to the appointment.  She was
tearful and sad.  She reported that she was still not taking
Seroquel, and was again instructed to restart the medication.
In May, she reported that her moods had improved, but her pain,
especially in her hip, had worsened.  X-rays of her pelvis and
hips were unremarkable.  She was observed to have degenerative
disk disease at L4-5, but it was uncertain whether this related
to her hip issues.

In June, Bell reported worsening pain, soreness, limping,
and more time spent in bed.  She reported worsening back pain
again in July, and in August she complained of pain in her neck,
back, and right arm that had become more severe over the prior
several weeks.  She exhibited tenderness to palpation in her
shoulders, neck, and back.  Three weeks later, her back pain was
stable, but her depression was worse due to family problems and
running out of a medication for panic disorder.  After she
reported worsening left hip pain again in September,
Riverfront's Dr. Hare referred Bell for an MRI, which was
unremarkable with no specific pathology evident.

In January 2008, Bell reported not sleeping well and
feeling more depressed after she stopped taking Lexapro, an

anti-depressant and anti-anxiety medication.  A month later, she complained of sharp pains shooting through her back and her legs almost giving out.  An MRI of the lumbar spine showed that Bell had degenerative changes of lumbar vertebrae and disks, including severe neural foraminal narrowing on the left side at the L2-L3 disk level.  The interpreting radiologist could not exclude involvement of the left L2 nerve root.  There were also some mild disk protrusions and disk bulges, some of which were associated with canal stenosis.  At her next appointment in March, Bell reported more pain in her upper back and difficulty sleeping due to pain.

In April 2008, Bell sought treatment at Concord Orthopedics.  She complained of a long history of lower-back pain radiating to the lateral aspect of her left hip.  On examination, she exhibited decreased lumbosacral range of motion in all planes due to pain and stiffness, and palpable tenderness about her left hip.  She was diagnosed with lumbar degenerative disk disease and left greater trochanter bursitis.  It was recommended that she start physical therapy.

Bell returned to Riverfront for another appointment in May 2008.  She informed Dr. Hare that her left hip pain was more severe and prevented her from walking, sitting, or sleeping. Her regular medications were not providing her with sufficient

relief.  On examination, she had diffuse tenderness to palpation and left hip tenderness.  Her depression was also worsening, but she refused to go back on treatment.  In June, Bell again complained of depression, chronic pain, and stress at home.

In July 2008, Bell complained of neck and head pain and difficulty sleeping.  She informed Dr. Hare that she had been arrested with her husband for selling Methadone.  Dr. Hare discussed pain medication abuse and informed Bell that she would not refill her narcotics prescriptions.  Over the next few weeks, Bell sought emergency medical care on three occasions.  She complained of pains in various parts of her body, including chronic pain in her back, and requested morphine.  Attending physicians did not prescribe her any narcotics and instead referred Bell to her primary care doctor.

In September 2008, Bell had a new patient intake visit with Dr. Nicole Antinerella at Concord Hospital's internal medicine department.  She complained of severe disabling chronic pain in her lower back and neck that prevented her from sleeping, and stated that she had nerve damage in both hips.  On examination, Bell's spine exhibited reduced mobility and tenderness, with the range of motion in her cervical spine extremely limited bilaterally.  There were also positive fibromyalgia tender points.  Dr. Antinerella advised Bell that she would restart her

on a much lower dose of morphine than she had been taking if she agreed to a pain management referral.

In October, Bell returned to Dr. Antinerella's office.  She complained of severe body pain "all over" and rated it as 10 on a scale of 1 to 10.  She also reported that she had been arrested for possible involvement in the sale of narcotics to an undercover police officer.[2]  She explained that it was a "false arrest" and that the medicine her husband was trying to sell was not hers.  Dr. Antinerella informed Bell that she would not be providing her with any opioids due to the arrest.

At the next month's follow-up appointment, Bell reported that while off of her usual pain medications her pain had been uncontrolled.  She rated its severity as greater than 10.  Examination showed that her condition had remained unchanged since the last appointment.  After reviewing the results of an unremarkable chest x-ray and pulmonary function test, Dr. Antinerella advised Bell that she did not have COPD.

Several weeks later, Bell presented to Dr. Paul Clark, who worked with Dr. Antinerella.  She complained of dramatically increased pain virtually everywhere, including pain in her upper back region, as well as trouble sleeping.  On examination, her

----

[2] It is unclear from the record whether Bell was reporting the July 2008 arrest or a subsequent incident.

spine exhibited tenderness and multiple trigger points consistent with the diagnosis of fibromyalgia. She had localized tenderness in left upper back and bilateral tenderness in her lower back. Dr. Clark chose not provide opioid therapy.

At her next appointment with Dr. Antinerella, in December 2008, Bell presented a letter from her attorney stating that her case had been resolved without trial. Bell reported that her pain "all over" had been unbearable, rating it as a constant 10 every day, and stated that she had been unable to sleep or function. She complained of malaise and fatigue, and reported that her pain was most severe in her spine and hips. On examination, her paraspinal muscles were extremely tender throughout the entire spine, and she exhibited limited range of motion throughout the cervical spine with point tenderness over the midthoracics. Multiple trigger points were noted on her extremities, and she exhibited tenderness in her bilateral hips and pain with minimal range of motion. Dr. Antinerella restarted her on opioids.

At her next appointment in January 2009, Bell stated that her pain was debilitating and that she was "unable to function." Her chronic pain was essentially unchanged, although the location varied. Dr. Antinerella increased the dosage of Bell's morphine prescription from two to three times a day.

7

In February 2009, Bell presented to Dr. Adam Cugalj for an orthopedic evaluation.  She reported diffuse pain in her head, neck, and upper, middle, and lower back that extended into each leg. Following an examination, Dr. Cugalj diagnosed Bell with: (1) depression; (2) diffuse myofascial pain; (3) right sacroiliac pain and dysfunction; (4) cervical and lumbar spondylosis; (5) deconditioning; (6) muscle imbalances with biomechanical deficits; (7) possible nutritional deficiency; (8) diffuse lumbar degenerative disk disease; (9) lumbar stenosis; (10) and lumbar focal disk herniation at L1-2, L3-4, and L4-5. He recommended that Bell begin functional-based physical therapy and a home exercise program.

In March 2009, Bell had a pain consultation with Dr. Yulan Wang.  Examination of her back revealed no visual evidence of structural abnormalities.  On palpation of her back, there was moderate tenderness on the right buttock, but her range of motion was within normal limits.  Her hip exhibited good internal range of motion and was pain free.  Dr. Wang's impression was that Bell's condition was most consistent with modic-type degenerative changes of the lumbar vertebral endplates.  She could not explain Bell's severe lower-back pain without radiographic and physical exam findings.

8

Several weeks later, Bell had an appointment with a nurse practitioner in Dr. Antinerella's office to follow up on another recent visit to the emergency room for chronic pain.  She continued to complain of pain in the back of her head.  On examination, her cervical spine exhibited a very limited range of motion in all directions.

In April 2009, a few weeks after seeing Dr. Antinerella for "all over body pain," Bell sought emergency medical care for neck pain.  An MRI of the lumbar spine showed no significant changes from her prior examination.  She was noted to have multilevel degenerative disk and facet disease.  The next day, Bell had an appointment with a nurse practitioner in Dr. Antinerella's office for her severe neck pain.  On examination, her cervical spine displayed a very limited range of motion in all directions, with mild paraspinous spasm in both the cervical and left trapezius region.  An MRI of her cervical spine revealed moderate spinal stenosis at C5-C6, which had progressed from the previous study and was associated with marked right and moderate-to-marked left degenerative neural foraminal narrowing. Degenerative wasting/borderline minimal spinal stenosis was observed at C6-7, which had mildly progressed from the previous study with mild to moderate bilateral degenerative neural foraminal narrowing.

At her next appointment with Dr. Antinerella in May 2009, Bell reported that she had self-referred to a spine center for epidural injections.  Bell's biggest complaint concerned ongoing issues with her back, with pain that radiated down her left leg, and neck pain that radiated down her left arm.  On examination, her cervical spine exhibited a very limited range of motion in all directions and her paraspinal muscles were very tender.

Two weeks later, Bell presented to a nurse practitioner in Dr. Antinerella's office, complaining of pain on the top of her head and difficulty sleeping.  She was very depressed, but the nurse was concerned about starting her on an anti-depressant because of her history of bipolar disorder.  At their next appointment in June, Bell reported having suicidal ideations that had passed.  She again complained of worsening hip and neck pain.  A week later, at an appointment with Dr. Antinerella, Bell complained of worsening migraines and neck pain.

At her last appointment with Dr. Antinerella, in August 2009, Bell reported that she had tripped over boxes she was moving and was experiencing worsening neck and back pain, as well as left hip and right shoulder pain.  She had gone to the emergency room after the fall.  On examination, she exhibited a very limited range of motion in all directions in her cervical spine, and her paraspinal muscles were very tender and in spasm.

Her fibromyalgia was noted to be stable on pain medication.  She
was strongly urged to consider going back to pain management.

In October 2009, Bell visited the Interventional Spine
Clinic, complaining of lower-back pain, hip pain, and nighttime
numbness in her shoulders.  She rated her pain at 9 out of 10,
and reported that 80% of her pain was relieved by medication.  A
nurse practitioner explained to Bell that the clinic did not
generally treat fibromyalgia with high-dose narcotics.  At a
follow-up appointment in January 2010, Bell again complained of
lower-back pain and fibromyalgia, and she reported 70% relief
from pain medication.  She reported the same the following
month.

At a follow-up appointment in April, Bell complained of
neck pain that radiated to her shoulders and arms.  She had pain
in her legs, muscle cramps, backaches, back pain, joint pain,
muscle pain, myalgia, and swelling of the lower extremities.
She again reported satisfaction with her medication regimen.  At
a follow-up visit in May, Bell's status was unchanged since her
last visit.  She continued to report that 70% of her pain was
relieved by medication.

In May, Bell also had an MRI of her cervical spine.  The
interpreting physician noted that: (1) degenerative changes were
worse at the C5-6 level, where there was mild to moderate

overall spinal canal narrowing, moderate right C6 neural foraminal narrowing, and moderate to severe left C6 neural foraminal narrowing; (2) degenerative changes were next most marked at the C6-7 level where there was mild spinal canal narrowing, moderate right C7 neural foraminal narrowing, and borderline moderate to severe left C7 neural foraminal narrowing; and (3) milder changes were seen elsewhere without any other evidence of neural compression to explain Bell's symptoms.  An MRI of the lumbar spine was interpreted to show multilevel up to moderate degenerative changes, without any clear evidence for neural compression.

At a follow-up visit to the Spine Clinic in June 2010, Bell reported that she continued to suffer from fatigue and pain in the neck, shoulder, back, leg, and hand.  Her pain relief from medication had dropped from 70% to 60%.  Trigger point injections were considered to try to alleviate Bell's pain.

Between September 2009 and March 2010, Bell also received treatment at Health First Laconia.  Her care provider was nurse practitioner Laura Zakorchemny.  At her first appointment, Bell complained of back pain, joint pain, muscle weakness, stiffness, and arthritis.  A month later, she complained of anxiety, but denied depression, memory loss, or mental disturbance.  In November, she again complained of anxiety due to problems with

her son.  She reported that Prozac was not helping with her anxiety.  In February 2010, she agreed to a renewed referral for psychotherapy.

In March, Nurse Zakorchemny and Dr. Bassem Azkul together completed medical source statements regarding Bell's physical and mental abilities.  They opined that Bell could lift less than ten pounds, could stand/walk at least two hours in an eight-hour workday, and could sit about six hours in an eight-hour workday.  They noted that Bell's ability to push and pull was limited in her upper and lower extremities.  Further, they opined that Bell was limited to occasional climbing, balancing, kneeling, crouching, crawling, stooping, and reaching.  Regarding Bell's mental abilities, they indicated that Bell's ability to understand, remember, and carry out detailed instructions was "markedly limited or effectively precluded," as was her ability to complete a normal workday and workweek without interruptions from psychologically based symptoms.  They added that their opinions regarding Bell's mental limitations were supported by the diagnosis of generalized anxiety disorder.

In February 2010, Bell underwent an intake assessment at Genesis Behavioral Health.  She complained of anxiety symptoms and reported panic attacks approximately five times per day.  She stated that migraine headaches kept her awake at night.  She

reported that her anxiety and depression were having a significant impact on her everyday functioning, and she appeared very upset.  She was diagnosed with adjustment disorder with mixed anxiety and depressed mood, and assigned a Global Assessment of Functioning ("GAF") score of 55.

At a follow-up appointment in May, Bell complained of worsening depression.  She was tearful throughout the interview and exhibited a depressed mood and affect.  Bell reported symptoms consistent with a depressive disorder, as well as anxiety with restlessness, muscle tension, excessive worry, and difficulty sleeping.  She was diagnosed with moderate major depressive disorder and generalized anxiety disorder.  She was assigned a GAF score of 68.  At a counseling session in July, Bell was extremely distressed and anxious.

B.    **Agency Examinations**

In October 2008, state agency reviewing physician Dr. Jonathan Jaffe reviewed Bell's record and completed a residual functional capacity assessment.  Dr. Jaffe opined that Bell was limited to the light exertional level and that her capacity was reduced primarily by pain.  Dr. Jaffe noted that, although Bell had reported fibromyalgia, the diagnosis had never been confirmed by a rheumatologist.

In November 2008, Bell underwent a comprehensive psychological profile with William Dinan, Ph.D.  She reported difficulties with bipolar disorder since 2001, increasing back pain due to spinal stenosis, significant neck pain subsequent to a surgery in 2003, and fibromyalgia that was diagnosed in 2001, resulting in pain on the left side of her face, head, hips, and ankles.  Bell's gait was slow and she walked with a cane.  She had some difficulty remaining seated, and was experiencing mild discomfort throughout the interview.

Bell was pleasant and outgoing throughout her interview. Her speech articulation was clear.  She had no significant problems with receptive or expressive language, and had no indications of looseness of association, pressured speech, or flights of ideas.  Dr. Dinan observed mild clinical signs of depression.  Bell reported daily sadness and weepiness, occasional suicidal thoughts but no intentions, and difficulty with sleep, primarily due to pain.  In the area of mania, Bell reported racing thought patterns which occasionally influenced her sleep onset.

Dr. Dinan also observed mild clinical signs of anxiety. Bell reported that she began exhibiting symptoms of anxiety within the prior two years, which she attributed to stressful

15

life events primarily involving her children.  Her affect tended
to reflect a depressive manner, along with a low self-image.

Dr. Dinan assessed Bell's current level of functioning, and
found that her ability to understand and remember instructions
was without impairment; her ability to interact appropriately
and communicate effectively was without impairment; her ability
to sustain attention and complete tasks was limited to brief,
light tasks completed on an intermittent basis; and her ability
to tolerate stresses common to a work environment limited her to
brief, light job tasks that allowed for intermittent attendance.
He diagnosed Bell with bipolar II disorder.

In December 2008, state agency reviewing psychologist Craig
Stenslie, Ph.D., reviewed Bell's record and completed a
psychiatric review technique form and a mental residual
functional capacity assessment.  Dr. Stenslie indicated that
Bell suffered from bipolar II disorder, and that the condition
produced mild restrictions in activities of daily living, mild
difficulties in maintaining social functioning, and moderate
difficulties in maintaining concentration, persistence, or pace.
Dr. Stenslie opined that Bell's allegations of impairments were
only partially credible and would appear possibly affected by
her drug-seeking behavior.

16

Dr. Stenslie further opined that Bell retained the mental residual functional capacity to deal adequately with short and simple instructions, to maintain attention for two hours, and to sustain ordinary routine without special supervision.  She could work within a schedule at a somewhat slower than usual pace and with a higher than typical number of interruptions.  She could deal adequately with change in a low stress environment.

**C.    Administrative Proceedings**

After her claim for disability benefits was denied at the initial level, Bell requested an administrative hearing.  Bell attended the hearing on August 13, 2010, and testified.  She was represented by counsel.  A vocational expert also testified.

On September 3, 2010, the ALJ issued a decision finding that Bell was not disabled because she retained the residual functional capacity to perform a significant number of jobs in the national economy.  Specifically, the ALJ found that Bell had the residual functional capacity to perform light work with unlimited use of her lower extremities to operate foot controls.  According to the ALJ, she could stand or walk for up to six hours in an eight-hour day, and sit for up to six hours in an eight-hour day.  The ALJ added that due to her mental health condition, Bell was able to: (1) deal adequately with short and simple instructions but would need some help with complex

instructions; (2) sustain attention for two-hour periods; (3) work near others; and (4) sustain an ordinary routine without special supervision.

The ALJ's decision became the final decision of the Commissioner on February 1, 2011, after the Decision Review Board failed to complete a timely review.

## II.   **STANDARD OF REVIEW**

Under 42 U.S.C. § 405(g), I am authorized to review the pleadings submitted by the parties and the transcript of the administrative record and enter a judgment affirming, modifying, or reversing the "final decision" of the Commissioner.  My review is limited to determining whether the ALJ used "the proper legal standards and found facts [based] upon the proper quantum of evidence." Ward v. Comm'r of Soc. Sec., 211 F.3d 652, 655 (1st Cir. 2000).

The findings of fact made by the ALJ are accorded deference as long as they are supported by substantial evidence.  Id. Substantial evidence to support factual findings exists "'if a reasonable mind, reviewing the evidence in the record as a whole, could accept it as adequate to support his conclusion.'" Irlanda Ortiz v. Sec'y of Health & Human Servs., 955 F.2d 765, 769 (1st Cir. 1991) (per curiam) (quoting Rodriguez v. Sec'y of

18

Health & Human Servs., 647 F.2d 218, 222 (1st Cir. 1981)).  If
the substantial evidence standard is met, factual findings are
conclusive even if the record "arguably could support a
different conclusion."  Id. at 770.

Findings are not conclusive, however, if they are derived
by "ignoring evidence, misapplying the law, or judging matters
entrusted to experts."  Nguyen v. Chater, 172 F.3d 31, 35 (1st
Cir. 1999).  The ALJ is responsible for determining issues of
credibility and for drawing inferences from evidence on the
record.  Ortiz, 955 F.2d at 769.  It is the role of the ALJ, not
the court, to resolve conflicts in the evidence.  Id.

The ALJ follows a five-step sequential analysis for
determining whether an applicant is disabled.  20 C.F.R. §
404.1520; 20 C.F.R. § 416.920.  The applicant bears the burden,
through the first four steps, of proving that his impairments
preclude him from working.  Freeman v. Barnhart, 274 F.3d 606,
608 (1st Cir. 2001).  At the fifth step, the ALJ determines
whether work that the claimant can do, despite his impairments,
exists in significant numbers in the national economy and must
produce substantial evidence to support that finding.  Seavey v.
Barnhart, 276 F.3d 1, 5 (1st Cir. 2001).

### III.   **ANALYSIS**

Bell moves to reverse and remand the Commissioner's decision denying her application for supplemental security income benefits on the grounds that the ALJ committed a number of errors in assessing her physical and mental residual functional capacity ("RFC") and in eliciting vocational expert testimony.  Because I find that the ALJ committed reversible errors in his assessment of Bell's physical RFC, I need not address her remaining claims.

In finding that Bell's physical impairments did not prevent her from performing light work with certain limitations, the ALJ gave substantial weight to the opinion of state agency consultative physician, Dr. Jaffe.  The ALJ gave little weight to the only other medical opinion on Bell's physical functioning.[3]  Bell challenges the ALJ's reliance on Dr. Jaffe's opinion because Dr. Jaffe did not have the benefit of significant medical evidence in the record that post-dates his opinion.

Social Security Ruling 96-6p provides that state agency consultants' opinions

---

[3] That other opinion is the medical source statement signed by Dr. Azkul and Nurse Zakorchemny.  Bell contends that Dr. Azkul is her treating physician and that the ALJ improperly rejected his opinion.  In light of my disposition of the case, I need not address that claim.

can be given weight only insofar as they are supported
by evidence in the case record, considering such
factors as the supportability of the opinion in the
evidence including any evidence received at the
administrative law judge and Appeals Council levels
that was not before the State agency, the consistency
of the opinion with the record as a whole, including
other medical opinions, and any explanation for the
opinion provided by the . . . consultant . . . .

SSR 96-6p, 1996 WL 374180, at *2. "[T]he amount of weight that
can properly be given the conclusions of non-testifying, non-
examining physicians will vary with the circumstances, including
the nature of the illness and the information provided the
expert." Rose v. Shalala, 34 F.3d 13, 18 (1st Cir. 1994)
(internal quotation marks and citations omitted). A state
agency consultant's opinion that is based on an incomplete
record, when later evidence supports the claimant's limitations,
cannot provide substantial evidence to support the ALJ's
decision to deny benefits. See, e.g., Alcantara v. Astrue, 257
Fed. Appx. 333, 334 (1st Cir. 2007); Padilla v. Barnhart, 186
Fed. Appx. 19, 21 (1st Cir. 2006); Russell v. Astrue, 742 F.
Supp. 2d 1355, 1378-79 (N.D. Ga. 2010); L.B.M. ex rel. Motley v.
Astrue, No. 1:08-cv-1354-WTL-DML, 2010 WL 1190326, at *13 (S.D.
Ind. Mar. 23, 2010).

In this case, it is unclear whether medical evidence
subsequent to Dr. Jaffe's evaluation undermines his opinion.
Dr. Jaffe's opinion is based on his review of the medical

21

records prior to his October 2008 opinion.  Bell's medical

conditions are documented through June 2010.  In addition to

subsequent treatment notes, the evidence that Dr. Jaffe could

not have reviewed includes a cervical MRI performed in May 2009

and lumbar and cervical MRIs performed in May 2010.  The

subsequent MRIs appear to suggest that Bell's condition was

deteriorating, but there is no medical opinion in the record

interpreting their results in functional terms.

     The ALJ could not rely on Dr. Jaffe's opinion as indicative

of Bell's current condition without first deciding that the

record underwent no material change since the date of Dr.

Jaffe's review.  See Alcantara, 257 Fed. Appx. at 334.  As a lay

person, however, the ALJ could not decide whether the subsequent

MRIs materially changed the record.  Nguyen, 172 F.3d at 35 ("As

a lay person, [] the ALJ was simply not qualified to interpret

raw medical data in functional terms and no medical opinion

supported the determination.").  Here, the ALJ did just that.

He discussed the results of the MRIs, extensively reciting

language from the reports that is beyond the ken a lay person,[4]

---

[4] The ALJ's description of the MRIs is as follows: "The May 2010
scan showed L2-3 mild to moderate spinal canal narrowing due to
a broad-based disc bulge and mild to moderate facet hypertrophy,
moderate foraminal narrowing at L3-4 with mild to moderate
spinal canal narrowing, and L4-5 mild spinal canal narrowing due
to a broad-based disc bulge with mild to moderate facet

and subsequently concluded that the record as a whole did not
match Bell's alleged physical limitations.  He erred in doing so
because "[a]bsent a medical advisor's or consultant's assessment
of the full record, the ALJ effectively substituted his own
judgment for medical opinion." Alcantara, 257 Fed. Appx. at
334; see Berrios Lopez v. Sec'y of Health & Human Servs., 951
F.2d 427, 430 (1st Cir. 1991) ("Since bare medical findings are
unintelligible to a lay person in terms of residual functional
capacity, the ALJ is not qualified to assess claimant's residual
functional capacity based on the bare medical record.").  The
ALJ, therefore, improperly concluded that Dr. Jaffe's opinion
provided significant evidence of Bell's current physical
capabilities by interpreting subsequent raw medical data as
consistent with that opinion.[5]

---

hypertrophy.  In the cervical spine, the scan showed C3-4 left-
sided asymmetric facet hypertrophy with only mild narrowing on
the left C4 foramen, C4-5 mild facet hypertrophy, C5-6 broad-
based disc osteophyte complex causing mild to moderate spinal
canal narrowing, and C6-7 mild narrowing with moderate to severe
left C7 neural foraminal narrowing."  Tr. 12.  As Bell points
out, the ALJ's review of the MRIs appears to be an overview, as
he did not include the statement from the report that
"[t]here is moderate right and moderate to severe left C6 neural
foraminal narrowing due to uncovertebral osteophytes."  Tr. 569.

[5] Even if I assume that the ALJ simply noted the results of the
MRIs but did not consider them in making the RFC assessment, as
the Commissioner suggests was the case, the ALJ nonetheless
erred because he "was not at liberty to ignore medical evidence
. . . ."  See Nguyen, 172 F.3d at 35.

The Commissioner's argument that regardless of the ALJ's
reliance on Dr. Jaffe's opinion, the ALJ appropriately evaluated
Bell's medical record is equally unpersuasive.  The ALJ's
rationales for his finding that "the record as a whole" did not
support finding Bell disabled due to her degenerative disk
disease of the cervical and lumbar spines simply do not bear the
weight placed upon them.

One rationale the ALJ offered is that on examination in
March 2009, Bell "displayed normal range of motion in the back,
good range of motion in the hips, and only moderate tenderness
on the right buttock."  Tr. 13.  He failed to reconcile this
treatment note with numerous examinations between April 2008 and
August 2009 where Bell exhibited very limited range of motion in
all directions in her cervical spine and diffuse tenderness in
her spine and hips.  The ALJ also reasoned that "[a]s early as
October 2006, doctors noted that the claimant's pain was
stable."  Tr. 13.  He again failed to indicate that he
considered treatment notes throughout the relevant time period
that repeatedly indicated that Bell was experiencing worsening
pain and reporting lesser degrees of relief from pain
medications.  Although conflicts in the evidence are for the ALJ
to resolve, see Ortiz, 955 F.2d at 769, the ALJ may not simply
ignore relevant evidence, especially when that evidence supports

24

a claimant's cause.  See Nguyen, 172 F.3d at 35; Suarez v. Sec'y
of Health & Human Servs., 740 F.2d 1, 1 (1st Cir. 1984) (per
curiam); Dedis v. Chater, 956 F. Supp. 45, 51 (D. Mass. 1997)
("While the ALJ is free to make a finding which gives less
credence to certain evidence, he cannot simply ignore the body
of evidence opposed to his view.") (internal quotation marks and
alterations omitted).

     The ALJ could have discounted evidence showing that Bell's
condition was more severe than what the cited evidence
indicated.  In the absence of an indication that the ALJ even
considered the conflicting evidence, however, "the reviewing
court cannot tell if significant probative evidence was not
credited or simply ignored." Cotter v. Harris, 642 F.2d 700,
705 (3d Cir. 1981).  Because he failed to demonstrate that he
considered the portions of the record that conflict with his
conclusion, the ALJ's determination that the record as a whole
did not support Bell's alleged physical limitations cannot
withstand review.  See Nguyen, 172 F.3d at 35.

     In sum, the ALJ improperly relied on Dr. Jaffe's outdated
opinion regarding Bell's physical RFC as substantial evidence
that Bell could perform light work.  The ALJ discussed the
results of the more recent MRIs that Dr. Jaffe could not have
considered, but without medical opinion on the issue.  Neither I

25

nor the ALJ is qualified to determine what those MRIs mean in functional terms without the assistance of an expert.  Lastly, the ALJ proceeded to cherry-pick evidence from the record to support his conclusion that "the record as a whole" did not match Bell's alleged limitations without acknowledging conflicting evidence.  These errors are significant enough to warrant a remand.

## IV.  CONCLUSION

For the foregoing reasons, I grant Bell's motion to reverse (Doc. No. 8), deny the Commissioner's motion to affirm (Doc. No. 12), and pursuant to 42 U.S.C. § 405(g), remand this case to the Social Security Administration.  The clerk is directed to enter judgment accordingly.

SO ORDERED.


                                   /s/Paul Barbadoro
                                   Paul Barbadoro
                                   United States District Judge
January 17, 2012

cc:  Francis M. Jackson, Esq.
     Karen B. Fitzmaurice, Esq.
     Gretchen Leah Witt, AUSA